# UNITED STATES DISTRICT COURT

for the
District of Colorado

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| | ) | Case No. 18-SW-00146-DLW |
| A device, further described as a **Black Verizon ZTE, Model-Z839 (serial # 321283994333) cell phone,** currently located at the Southern Ute Police Department, Ignacio, CO 81137 | ) ) ) ) ) ) | |

More fully described in Attachments A, attached
hereto.

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

located in the _____State and_____ District of _____Colorado_____, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1), (b)(1)(B)(viii) | Possession with the Intent to Distribute or Dispense More than 50 Grams of a Methamphetamine Mixture |

The application is based on these facts:
- X Continued on the attached affidavit, which is incorporated by reference.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Shane G. Aragon, Detective, SUPD
*Printed name and title*

Sworn to before me and: ☒ signed in my presence.
☐ submitted, attested to, and acknowledged by reliable electronic means.

Date: 10/17/18

*Judge's signature*

City and state: Durango, CO

DAVID L. WEST US MAGISTRATE Judge
*Printed name and title*

AO 93 (Rev. 11/13) Search and Seizure Warrant

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Shane G. Aragon, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      Your Affiant makes this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic Device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in **Attachment B**.

2.      Your Affiant is a Detective for the Southern Ute Police Department and has been since July 2015. Your Affiant has received on the job training by the Southwest Drug Task Force (SWDTF) and has been working joint drug investigations with the SWDTF since November 2013.  Your Affiant has completed the DEA Basic Drug Investigator training and also graduated from the Department of the Interior Investigator Training Program.  Your Affiant has worked numerous drug cases involving several different types of controlled substances. Your Affiant has seized several types of illegal dangerous drugs and drug paraphernalia, most commonly Methamphetamine, Heroin, and Cocaine. Your Affiant is responsible for the protection of life and property through the enforcement of laws within the exterior boundaries of the Southern Ute Indian Reservation. Your Affiant began his law enforcement career as an Officer in the Southern Ute Detention Center, before becoming a trainee for the Southern Ute Police Department Patrol Division. In May of 2011 your Affiant graduated from the Southwest Regional Law Enforcement Academy in Durango CO and

subsequently successfully completed the Southern Ute Police Department Field Training Program. In October 2012, your Affiant became a Field Training Officer and remained as such until he was assigned to the Special Investigations Division.  Your Affiant has attended numerous law enforcement trainings throughout his career, which includes but is not limited to Jurisdiction in Indian Country thus receiving a Bureau of Indian Affairs, Special Law Enforcement Commission, in this capacity your Affiant is authorized to investigate crimes under Title 21 of the United States Code.

3.      The facts in this affidavit come from your Affiant's personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on your Affiant's training and experience and the facts as set forth in this affidavit, there is probable cause to believe that a violation of Title 21 United States Code 841(a)(1), (b)(1)(B)(viii), Possession with the Intent to Distribute or Dispense More than 50 Grams of a Methamphetamine Mixture, involving Jamie Jesus LOBATO (DOB: 09/12/1976). There is also probable cause to search a black Verizon ZTE cellular device as described in Attachment A for evidence of this crime as described in Attachment B.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5.      The property to be searched is a **black Verizon ZTE, Model-Z839 (serial # 321283994333) cell phone**, hereinafter referred to as the "Devices" or "Device".  The Device

2

is currently secured in the Southern Ute Police Department evidence room, Ignacio CO, 81137. See Attachment A.

      6.     The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## **TECHNICAL TERMS**

      1.     Based on my training and experience, your Affiant uses the following technical terms to convey the following meanings:

    a.  Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless Device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also

3

include global positioning system ("GPS") technology for determining the location of the Device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage Device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation Device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some

4

GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.   IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

f.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet,

5

connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

g. Application (App):  Typically a small, specialized program downloaded onto mobile devices.

## PROBABLE CAUSE

2. On 10/10/20118 at approximately 5:57 pm, Southern Ute Police Dispatch received a call reporting, a small red hatchback car was suspicious and driving slowly through a tribal housing area named Cedar Point. The reporting party said the driver was a white male and the he was looking at all the houses.

3. Southern Ute Police Sergeant Jesse Vigil responded to the area and saw a vehicle matching the description, parked facing north, in front of 23 Frybread. Sgt. Vigil described the vehicle as a red Hyundai SUV bearing CO plate SVO689 on the rear of the vehicle. Sgt. Vigil said he drove past the vehicle northbound on Frybread and as he drove by the vehicle, a male driver turned and looked at him. Sgt. Vigil also saw a female passenger who he recognized as Destinee Aguilar, a minor child, known to have active tribal warrants.

4. Sgt. Vigil turned around in a driveway just up the road to try and make consensual contact with the two occupants of the vehicle. As he was turning around, he saw Aguilar exit the vehicle and walk towards 23 Frybread. Aguilar went behind a

6

privacy fence and he lost sight of her. Sgt. Vigil said the red vehicle started to drive away and he noticed it did not have a front license plate attached as required by tribal and state law. Sgt. Vigil then stopped the red vehicle.

5.      Sgt. Vigil identified himself and advised the driver he had been called in as a suspicious vehicle. Sgt. Vigil asked the male what he was doing, the male said he was "just looking for my friend's house." Sgt. Vigil then advised the male that he stopped him because there was no front license plate attached to his vehicle.

6.      Sgt. Vigil asked the male for his license and registration. The male told Sgt. Vigil, he did not have a license because it was suspended for not paying child support. Sgt. Vigil asked the male his name and the male identified himself as, Jamie LOBATO (DOB: 09/12/76). LOBATO's Colorado ID was later found in his wallet and confirmed his identity. LOBATO only gave Sgt. Vigil the vehicle's insurance card and claimed the vehicle belonged to his mother.

7.      Sgt. Vigil asked LOBATO what his mother's name was. LOBATO advised, Darlene Alexander. Alexander was the registered owner of the vehicle. Sgt. Vigil asked LOBATO for a contact number for Alexander so he could confirm if LOBATO was allowed to have the vehicle or not. LOBATO provided a number of 970-844-0091. Sgt. Vigil called Alexander and she confirmed LOBATO was allowed to have the vehicle.

7

8.      Due to LOBATO not knowing where his friend's house was, his nervous

behavior and how bad he was shaking, Sgt. Vigil asked Alexander if he could search her

vehicle for any illegal substances. Alexander advised LOBATO should not have

anything illegal in the vehicle and that Sgt. Vigil could search the vehicle.

9.      Sgt. Vigil walked back up to LOBATO and asked him if there was

anything illegal in the vehicle that he should know about, including marijuana.

LOBATO said he had marijuana in the middle console. Sgt. Vigil also advised

LOBATO that since he was on the Southern Ute Indian Reservation, he could not

possess marijuana. LOBATO said "weed?" and did not seem to understand marijuana

was illegal on the reservation. Sgt. Vigil advised LOBATO that marijuana was still

illegal under federal law.

10.     Sgt. Vigil had LOBATO exit the vehicle so he could get the marijuana.

As LOBATO was exiting the vehicle, LOBATO reached for a grey and black jacket in

the back seat. LOBATO asked Sgt. Vigil, "Can I get my coat?" Sgt. Vigil advised

LOBATO not to grab his jacket and he would grab it for him. Sgt. Vigil advised

LOBATO he wanted to check his jacket before he gave it to him.

11.     Sgt. Vigil grabbed LOBATO's jacket from the back seat, grabbed the

right chest pocket and immediately felt a hypodermic needle. Sgt. Vigil asked LOBATO

if he had any needles in his jacket. LOBATO said he did not have any needles. Sgt.

Vigil asked LOBATO if I could get the "object" out since he did not know what it was.

8

LOBATO shook his head no and said, "that's my coat" twice. Sgt. Vigil advised LOBATO he knew the object was a needle and was going to get it out. Sgt. Vigil unzipped the pocket and pulled out two unused hypodermic needles that were capped and showed them to LOBATO. LOBATO said something to the effect of, they're unused. Sgt. Vigil asked LOBATO what he used the needles for. LOBATO advised he did not use them.

12.     Sgt. Vigil continued to search LOBATO's jacket for more paraphernalia and felt another hard object in his right pocket under the chest pocket. Sgt. Vigil looked inside the pocket and could see a plastic bag with a white crystal like substance inside. Sgt. Vigil placed the jacket on the front seat and walked to LOBATO and placed him in handcuffs. Sgt. Vigil walked back to the jacket and pulled the plastic sack out and placed it on the vehicle. Sgt. Vigil found a second plastic bag in the inside right pocket. Through training and experience Sgt. Vigil recognized both baggies with a crystalline substance in them to be methamphetamine.  Sgt. Vigil asked LOBATO what was in the two plastic bags. LOBATO said something to the effect of, "that's not mine."

13.     Sgt. Vigil continued a search of the vehicle and found a large glass jar full of a green leafy substance in the middle console where LOBATO said the marijuana was. Sgt. Vigil also found a small black scale in the driver's door, two small pieces of tin foil with folded with a white powdery substance inside in the driver's door and a bottle of prescription oxycodone for Alexander in the glove compartment.

9

14.     Sgt. Vigil called Your Affiant and explained what he had found. Your Affiant arrived at 23 Frybread in Ignacio CO and met with Sgt. Vigil. Sgt. Vigil went to the back of his patrol car a pulled out an evidence bag with two baggies containing a large quantity of an unknown crystalline substance that through my training and experience looked to be methamphetamine.

15.     Sgt. Vigil also gave Your Affiant an evidence bag containing a black Verizon ZTE cellular phone ("the Device") Sgt. Vigil removed from LOBATO's possession. Your Affiant took possession of the substances and the Device then drove back to the Southern Ute Police Department.

16.     Your Affiant weighed and tested the substance. The crystalline substance weighed approximately ninety grams and tested presumptively positive for methamphetamine.

17.     Your Affiant removed the back cover on the Device and removed the battery, to prevent the destruction of any evidence and to also preserve any evidence stored within the Device. The information behind the battery of the Device revealed the model number of the devise is Z839 and a serial # of 321283994333.

18.     Sgt. Vigil transported LOBATO the Southern Ute Police Department and waited for Your Affiant.

10

19.     Your Affiant walked over to Sgt. Vigil's patrol car and spoke to LOBATO. Your Affiant introduced himself and then advised LOBATO of his Miranda rights. LOBATO waived his rights and agreed to speak with Your Affiant. Your Affiant asked LOBATO about the incident. LOBATO said the jacket belonged to his ex-girlfriend. Your Affiant asked if LOBATO knew about the drugs in the jacket. LOBATO said he had discovered that the jacket had the methamphetamine in it around twelve o'clock that day (10/10/2018). Your Affiant asked LOBATO if he had recently used methamphetamine and LOBATO responded that he had the day before yesterday (October 8, 2018). Your Affiant asked LOBATO what he was doing in the area, LOBATO said he was at the casino and then he gave an unknown female a ride home where he was contacted.

20.     Your Affiant asked LOBATO where he gets the meth he uses. LOBATO said from his "ex." Your Affiant asked LOBATO what his ex's name was.  LOBATO said Gabriella ALBO. Your Affiant asked LOBATO about the foil found in the vehicle. LOBATO said his "ex" left the foil in the vehicle and the syringes. Your Affiant asked LOBATO why earlier he had claimed the jacket. LOBATO said he wanted it because it was cold out.

21.     Your Affiant ended the interview and had Sgt. Vigil transport LOBATO to La Plata County Jail.

11

22.     While booking LOBATO into the La Plata County Jail, Sgt. Vigil found a second scale in LOBATO's belongings.

23.     The Device is currently in a secure evidence room at the Southern Ute Police Department.  In your Affiant's training and experience, he knows the Devices have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the Southern Ute Police Department.

24.     Based on your Affiant's knowledge, training, experience, and consultation with other law enforcement investigators who have been involved in the investigation and prosecution of narcotics, your Affiant knows that cellular devices are used to coordinate co-conspirators, to record and disseminate text messages, e-mail messages, digital communication, financial transactions, photographs, audio/video recordings of the planning, execution, completion, or other evidence of instruments, tactics, and fruits of criminal endeavors, in the sales and distribution of controlled substances.

25.     Your Affiant is aware that cellular telephones and mobile devices, such as the Device, contain a vast array of data and information, which can be deleted and is maintained only on the cellular telephone and is not maintained or stored by the cellular or e-mail carrier.  This data such as assigned phone number and phone identifying information (serial number, IMEI, etc) address book/contact information, text or MMS

messaging content, call logs, pictures, email and/or attachments, instant messaging or social networking data, audio recordings, documents, GPS locations, Cell Sites and/or WI-FI Network connections and other data that can be vital to a criminal investigation by detailing the nature, content of communications events and/or locations of communications events with other individuals.

Your Affiant knows from training and experience that individuals rely heavily in their day-to-day activities and actions on cellular telephones and electronic communications in the form of telephone calls, voice messages, SMS text messages, social media posting and other like communications that cause their cellular telephone to emit and receive electronic signals to and from cellular telephone company cell sites. Your Affiant knows from training and experience that individuals typically carry their cellular telephones upon their person or within arm's reach at all times.

26.     Your Affiant knows from training and experience that individuals discussing their criminal activity may use slang, short forms (abbreviated words or phrases such as "lol" to express "laugh out loud"), or code words (which require entire strings or series of conversations to determine their true meaning) when discussing their crimes. The individuals can also discuss aspects of the crime without specifically mentioning the crime involved. In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face or the manipulation and combination of keys to convey an idea, such as the use of a colon and paren ":)" to convey a smile or agreement) to discuss matters.

Keyword searches would not account for any of these possibilities, so actual review of the contents of the electronic messages by law enforcement familiar with the identified criminal activity is necessary to find all relevant evidence.

27.     Your Affiant knows from training and experience that the data and information described above can be of significant assistance to the investigation and evidence in a subsequent criminal prosecution by showing the communication records/pattern(s) between any co-conspirators, capturing photos which can be evidence, indicate the general geographic area that the cellular phone, mobile device and/or PDA was located at, as well as provide investigative leads of either witnesses or suspects communicated with prior, during and after a criminal event, which can associate the cellular phone/device to a specific suspect or individual.  Additionally, the data and information can assist with establishing a pattern of life to include such information as normal types of digital usage (social media, websites, messaging…), normal digital usage times (day, night, duration) and travel patterns as well as establish significant deviations from the normal pattern of life.  Your Affiant knows from training and experience that individual(s) involved in criminal activities often exhibit a deviation from the normal pattern of life to include changes in frequency of cellular telephone calls, mobile messaging and internet searches prior to, during, or after the commission of a criminal event.  The deviations from the normal pattern of life can assist investigators in identifying any co-conspirator(s), who may have provided aid or counsel, during the relevant time period surrounding the conception, planning, commission, and/or cover-up of criminal activity.  Further, the data and information described above can validate or

conversely dispute witness statements and an individual's alibi for their location and conduct leading up to, during and following the criminal event; here, specifically to establish or dispute LOBATO's alleged pattern of activity and movements prior to being contacted by law enforcement.

28.     Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online at https://www.zteusa.com/blade-vantage, your Affiant knows the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS, can store IP addresses, and access the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the Device, as well as the information and details set forth in the paragraphs above.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

29.     Based on my knowledge, training, and experience, your Affiant knows electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the Device.  This information can sometimes be recovered with forensics tools.

30.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it,

15

and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

31.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your Affiant is applying for would permit the examination of the Device consistent with the warrant.  The examination may require authorities to employtechniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Device to human inspection in order to determine whether it is evidence described by the warrant.

32.     *Manner of execution.*  Because this warrant seeks only permission to examine a Device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, your Affiant submits there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

33.     Your Affiant submits that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Shane G. Aragon
Drug Detective
Southern Ute Police Department


Subscribed and sworn to before me on October _17ᵗʰ_, 2018.

DAVID L. WEST
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

1.      The property to be searched is a **black Verizon ZTE, Model-Z839 (serial # 321283994333)** cell phone, This Device is currently secured in the Southern Ute Police Department evidence room, Ignacio CO, 81137.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.     All records and information on the Devices described in Attachment A that constitute fruits, evidence and instrumentalities of a violation of Title 21 United States Code 841(a)(1), (b)(1)(B)(viii), Possession with the Intent to Distribute or Dispense More than 50 Grams of a Methamphetamine Mixture, involving Jamie Jesus LOBATO, a non-Indian male, date of birth: 09/12/1976;

     a.  Lists of address book contacts;

     b.  Lists of calls made and/or received;

     c.  Lists of text messages (SMS and MMS) sent and/or received and content pertaining to those messages;

     d.  Lists of voicemail messages sent and/or received and content pertaining to those messages;

     e.  Lists of emails sent and/or received and content pertaining to those messages;

     f.  Any stored pictures, videos, or other files contained within Device memory and/or removable memory cards;

     g.  GPS location information and/or logs of previous location information;

     h.  Internet connection information including records of Internet Protocol addresses used

     i.  Instant Messaging (IM) chat logs and content pertaining to those chats;

j.   Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.     Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.: 18-SW-00146-DLW | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*